# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| NETWORK MONITORING LLC, | § § § | Case No. 2:21-cv-00148-JRG |
| Plaintiff, | § § | **<u>JURY TRIAL DEMANDED</u>** |
| v. | § § | |
| SKYSCANNER LTD., | § § | |
| Defendant. | § § § | |

## PLAINTIFF NETWORK MONITORING LLC'S
## <u>P.R. 4-3(a) OPENING CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

Page(s)

I.   CLAIM CONSTRUCTION STANDARD OF REVIEW ................................................ 1

     A.   GOVERNING LAW .................................................................................... 1

     B.   LEVEL OF ORDINARY SKILL IN THE ART .................................................. 1

II.  PATENT BACKGROUND AND TECHNOLOGY ........................................................ 1

     A.   DISPUTED TERMS .................................................................................... 6

          i.    "ordered combination" (Claims 1 and 6 of the '416 Patent and
                Claims 1 and 17 of the '946 Patent) ........................................ 6

          ii.   "an original URL" (Claims 1 and 6 of the '416 Patent and Claims
                1 and 17 of the '946 Patent) .................................................... 9

          iii.  "[[at least one]] a rewritten URL" / "the rewritten URL" / the
                rewritten embedded URL[[s]]" / "[[Each of ]] the rewritten
                embedded URL[[s]]" (Claims 1 and 6 of the '416 Patent and
                Claims 1 and 17 of the '946 Patent) ........................................ 11

          iv.   "form[ing] parameter data based upon predetermined selection
                parameters from the database" (Claims 1 and 6 of the '416 Patent
                and Claims 1 and 17 of the '946 Patent) .................................... 14

          v.    "dynamically maintain[ing] the predetermined selection
                parameters based upon revisable, operator-defined instructions on
                how to select and extract information from a text page; and
                analyzing the parameter data sets to predict future user activity"
                (Claims 5 and 10 of the '416 Patent) ........................................ 16

          vi.   "[[the]] a response" / "[[a]] the response" / "embedding the
                rewritten URLs in [[the]] a response" / "receiving [[a]] the
                response from Web server" / "forwarding the response to the user
                browser" (Claims 1, 2, 6, and 7 of the '416 Patent and Claims 1,
                10, 17, and 25 of the '946 Patent) ........................................... 18

          vii.  "provide profiling and analysis of at least one session" (Claims 1
                and 17 of the '946 Patent) ...................................................... 20

viii.    "3. The method of claim 1, where the causing the Web page specified by the Web server URL to be returned to the user comprises redirecting the user browser to the Web page on the Web browser" / "8. The apparatus of claim 6, where the apparatus causes the Web page specified by the Web server URL . . ." / "11. The apparatus of claim 1, where the apparatus causes the Web page specified by the Web server URL . . ." / The method of claim 17, wherein the Web page specified by the Web server URL . . ." (Claims of the '3 and 8 of the '416 Patent and Claims 11 and 26 of the '946 Patent).......................................................... 22

III.    CONCLUSION................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AGIS Software Dev., LLC v. Huawei Device USA Inc.*,
   No. 2:17-cv-513-JRG, 2018 WL 4908169 (E.D. Tex. Oct. 10, 2018) ....................................1

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003)..................................................................................7, 8

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014)................................................................... *passim*

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
   540 F.3d 1337 (Fed. Cir. 2008)..................................................................13, 22, 23

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001)............................................................................7

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)..............................................................................8

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2004) (en banc)..............................................................8

*Superguide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004)..............................................................................22

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)...............................................................................10

**Other Authorities**

Authoritative Dictionary of IEEE Standards Terms (Seventh Edition) (December
   1, 2000) ...........................................................................................................11, 13

Pursuant to P.R. 4-5(a) and the Court's Docket Control Order of December 3, 2021 (Dkt. 19), Plaintiff Network Monitoring LLC ("Network Monitoring") hereby submits its Opening Claim Construction Brief.  The asserted patents are U.S. Patent No. 9,058,416 (the "'416 Patent" Ex. A) and U.S. Patent No. 9,680,946 (the "'946 Patent" Ex. B) (collectively, the "Asserted Patents").

## I.     CLAIM CONSTRUCTION STANDARD OF REVIEW

### A.     GOVERNING LAW

The governing legal standards relating to claim construction are described in the Court's opinion in *AGIS Software Dev., LLC v. Huawei Device USA Inc.*, No. 2:17-cv-513-JRG, 2018 WL 4908169, at *3-*5 (E.D. Tex. Oct. 10, 2018) and are hereby incorporated by reference.

### B.     LEVEL OF ORDINARY SKILL IN THE ART

The Asserted Patents are generally directed to tracking and reporting online activity. Network Monitoring submits that a person of ordinary skill in the art ("POSITA") would have a bachelor's degree in computer science or computer engineering with one to two years of experience in the field of programming for web and client-server services and internet routing, or equivalent education and work experience.  Extensive experience and technical training may substitute for educational requirements, while advanced education may substitute for experience.

## II.     PATENT BACKGROUND AND TECHNOLOGY

The '946 Patent claims priority to Application No. 10/103,827 filed on December 11, 2001 (the "'827 Application") which issued as the '416 Patent on June 16, 2015.  On June 15, 2015, the '827 Application produced Continuation Application 14/739,992 (the "'992 Application") which was granted as the '946 Patent on June 13, 2017.  The '946 Patent and the '416 Patent both claim priority to Application Ser. No. 60/254,609, filed on December 11, 2000 (the "'609 Application") and Application Ser. No. 60/292,572, filed on May 22, 2001 (the "'572 Application"). The

Asserted Patents share a common specification.

The patented invention generally pertains to "tracking and reporting online activity across a plurality of clients and servers" with a system that "intercepts and logs secure and non-secure HTTP request and response pages, analyzes each of the received page records, associates each page record to an event type based on user-defined parameters, identifies and extracts user-defined attributes of each page record based on its event type, and reports on the occurrence of the event along with its associated attributes." Ex. A, at Abstract.

In embodiments of the invention, an "Event Tracking System (ETS)" "effectively reports on many different types of known online activity and data including, but not limited to: purchases from the sale of goods and services online, online shopping cart abandonment, airline ticket reservations, credit card type usage, user account creation, and contest or sweepstake entries. In accord with the present invention, ETS provides event specific attributes such as purchase amounts, cart item names, travel dates, e-mail addresses and zip codes." *Id.* at 4:26-35. For example, embodiments may "make[] use of a proxy agent for the purpose of capturing HTTP transmission records. . . . A proxy agent acts both as a server and a client by accepting requests from client browsers, initiating requests to Web servers on behalf of the clients, receiving responses from Web servers, and forwarding the responses back to the client browsers." *Id.* at 4:39-54. For example, a "data capture module" may be "implemented as a URL-rewriting proxy agent 111," which "works by rewriting URLs such that the original URL is encoded as part of the path of the proxy URL. The rewritten URL causes the browser to send a request to URL-proxy. The proxy then extracts the original URL from the path of the rewritten URL, sends a request to the original host, receives the response from the original host and serves the response data to the browser." *Id.* at 5:65-66, 6:18-25.



FIG. 1 ETS Software Architecture

For example, embodiments of the invention provide identification and extraction of data in captured transmissions on an exemplary basis as depicted in Figure 3:

A site object 301 represents a Web site for which an embodiment of the present invention tracks and reports online activity. A site-domain object 302 represents a domain under which a site is hosted. A single site may be hosted on multiple site-domains, as expressed in the relationship 351. A site-page object 303 represents a type of page that is found within a site, for example, a cart checkout page. In general, a site-page is any page that contains event-related information or expresses the occurrence of an event. A single site can have multiple site pages, as expressed by relationship 352. A logged-page object 304 represents an individual HTTP transmission record. An identification-method object 305 represents an algorithm for matching a site-page with a logged-page. A site-page can have only one identification-method, as expressed by relationship 354. An identified-page object 307 represents a logged-page that has been matched to a site-page according to the site-page's identification-method. It should be noted that a site-page may identify multiple logged pages, whereas an individual logged-page may be identified by at most one site-page, as expressed by relationship 353. A parse-method object 306 represents an algorithm and algorithm parameters for extracting attributes from a logged-

3

> page record. A site-page may have multiple parse-methods, as expressed by relationship b. A parse-attribute object 308 represents the set of attributes that result from the application of a parse-method to an identified-page record. It should be noted that multiple parse-attributes may result from the single application of a parse-method. Furthermore, multiple parse-methods may be applied to an identified-page. A single identified-page may have multiple parse-attributes, as expressed by relationship 357.

*Id.* at 10:4-37. The specification goes on to provide "a pseudo-code description of the identification process according to an embodiment of the present invention." *Id.* at 10:38-40, Table 2.



FIG. 3 Data Identification and Extraction Entities

For example, embodiment of the invention provides analysis of data on an exemplary basis as depicted in Figure 4:

> An event-type object 401 represents a type of event, such as an e-commerce purchase. A site-event object 402 represents the set of event-types that may be detected in a site. The same event-type may be detected on multiple sites, and each site may have multiple detectable event-types, as expressed in the relationship 451. A site-page-event object 403 represents the set of site-events associated with a site-page. A single site-page may associate with multiple site-

4

> events, as expressed in the relationship 452. For example, an e-commerce checkout page may also serve as a user-registration page. An identified-page-event object 405 is the set of site-page-events for an identified-page. Recall that identified-pages are matched by a site-page. An identified-page-event record is created for each site-event associated with a site-page that matches an identified-page. Since there may be multiple site-events per site-page, it follows that there are multiple site-page-events associated with an identified-page, as expressed in the relationship 453. An event object 404 represents a detected event, created as a result of event detection applied to identified-page-events. A session object 406 is a grouping of logged-pages by browser and log date. There may be multiple logged-pages per session, as expressed in the relationship 455. Consequently, since identified-pages and identified-page-events, are derived from logged-pages, it follows that are [sic] may be multiple of these objects per session, as expressed in the relationships 456 and 457. Multiple events may also be detected in the same session, as expressed in the relationship 458.

*Id.* at 12:16-45. Session analysis algorithms may further "group[] logged pages by browser and log data." *Id.* at 12:46-58. The specification similarly "provides a pseudo-code description of the real-time session analysis algorithm." *See Id.* at 12:59-61, Table 3.



FIG. 4 Data Analysis Entities

Exemplary embodiments of the claimed invention further provide storage of "logged-page records, user-defined parameters for identification and extraction (hereinafter, "site profiles"),

extracted parse-attributes, event data and report data." *Id.* at 16:46-49. "According to the application architecture of an embodiment of the present invention, and referring back to FIG.1, the profile management module 160 has four components: site management 161, session verification 162, profile reports 163, and administration 164." *Id.* at 16:60-64. Embodiments of the invention further provide for profiling and "live traffic analysis," including based on "[s]ite profiles are the user-defined parameters used by the identification, extraction and analysis modules to: identify the site for a logged-page record; associate logged-page records with site-pages; associate site-pages with event triggers, event pre-triggers, and parse-methods." *Id.* at 18:9-24.

### A.    DISPUTED TERMS

#### i.    "ordered combination" (Claims 1 and 6 of the '416 Patent and Claims 1 and 17 of the '946 Patent)

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning; No required ordering | These claims require a specific ordered combination: (1) "providing the user browser with a Web page containing a URL . . ." (2) "determining a Web server URL . . ." (3) "identifying and extracting"; (4) "forming parameter data"; (5) "encoding an original URL as part of the tracking system URL" (6) "embedding the rewritten URLs in the response . . ." (7) "causing the Web page specified by the Web server URL to be returned to the user browser." |

Defendant improperly seeks to limit the asserted claims to steps practiced in the recited order, but a POSITA would not understand the claims to require a specific ordered combination of steps.  Because neither the claim language nor the specification directly or implicitly limits the asserted claims to an ordered combination, Defendant's proposal should be rejected.

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  While a court may construe claims to impose an order where the method steps directly or "implicitly require that they be performed in the order written," such a narrow construction is not required here. *Id.*  In *Altiris, Inc. v. Symantec Corp.*, the Federal Circuit described a two-part test for determining whether to apply an implicit order to a claimed method.  "First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written. . . . If not, we next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction.  If not, the sequence in which such steps are written is not a requirement." 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) (quoting *Interactive Gift*, 256 F.3d at 1343, 1416) (internal citations and quotations omitted).

It is indisputable that Asserted Claims do not directly recite a required order of steps.  Nor do Asserted Claims "implicitly" require an order of steps, either within the claim language or in the rest of the specification.

<u>First</u>, the claim language itself does not require a specific order of steps – let alone that *every* step must occur in the order recited as Defendant proposes.  Rather, the claim language weighs ***against*** importing any ordered combination requirement because the patentee was explicit when it intended to claim any temporal limitation.  For example, the patentee explicitly claimed

"***upon receipt by the tracking system of a Web page request***[1] . . . determining a Web server URL." Ex. A, 23: 25-27.  Had the patentee intended to claim any specific order of steps, it would have done so.  It did not.  Defendant also entirely disregards that steps may overlap or occur simultaneously.

Second, the specification does not impose any requirement that all steps of the Asserted Claims occur in the order recited.  Defendant apparently relies on Figures 1, 3, 5 and associated discussion to argue that the specification dictates a specific order.  *See* Dkt. 27-2.  However, it is axiomatic that claims are not ordinarily limited in scope to the preferred embodiment.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2004) (en banc); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").  "These principles apply with equal force where, as is the case here, the limitation to be imported from the specification is an order of method steps, rather than a limitation on a specific claim term."  *Altiris*, 318 F.3d at 1370.  Here, as in *Altiris*, "[n]owhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps."  *Id*. at 1371.

Finally, Defendant's attempt to add an order of steps to system Claim 6 of the '416 Patent and claim 1 of the '946 Patent further fails because there is no legal authority to support the importation of an order of steps to a system claim.

Accordingly, the Court should reject Defendant's proposed requirement for a specific ordered combination of steps.

---

[1] Emphasis added unless otherwise noted.

### ii. "an original URL" (Claims 1 and 6 of the '416 Patent and Claims 1 and 17 of the '946 Patent)

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a URL embedded in the response to the Web page request from the user browser" |

The term "an original URL" appears in Claims 1 and 6 of the '416 Patent and Claims 1 and 17 of the '946 Patent. For example, Claim 1 of the '416 Patent recites "providing the user browser with a Web page containing a URL specifying both an address of the tracking system and information that specifies a URL on the Web server . . . determining a Web server URL from the Web page request . . . identifying and extracting captured information indicating that the user browser has requested the Web server URL . . . encoding *an original URL* as part of the tracking system URL path to construct at least one rewritten URL; embedding the rewritten URLs in the response . . . and causing the Web page specified by the Web server URL to be returned to the user browser." A POSITA, and lay juror for that matter, would thus understand the plain and ordinary meaning of "original URL" to refer to a URL encoded as part of the tracking system without the need for construction. Defendant improperly seeks to rewrite this term as "a URL embedded in the response to the Web page request from the user browser," but lacks any basis to do so. Moreover, Defendant identifies no lexicography or disavowal of scope that would justify a departure from the plain and ordinary meaning of this term. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

First, the term "original" has a readily understandable plain-English meaning in the context of the claim, referring to, for example, an "original URL" encoded as part of a tracking system. *See* Ex. A, Claim 1. Defendant fails to identify any lexicography or disavowal that would warrant a departure from that plain and ordinary meaning or would justify its reliance on extrinsic evidence.

*See Hill-Rom Servs.,* 755 F.3d at 1371 ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal.") (citations omitted).

Second, Defendant's proposal reflects an improper attempt to narrow the claim term in support of its non-infringement positions and should be rejected out of hand.  Defendant appears to conflate the term "original URL" with "rewritten URL" to require that any "original URL" is also "embedded . . . in the response."  *See* Ex. A, Claim 1.  But there is no basis for re-writing the claims such that every "original URL" encoded as part of a tracking system must be embedded in the same manner as a "rewritten URL."  For example, Claim 1 requires a "rewritten URL" constructed based on "encoding an original URL as part of the tracking system's URL path." While a "rewritten URL" may be a form or "original URL," there is no basis to require that *every* original URL encoded by a tracking system be embedded in a response.  Moreover, Defendant would effectively read out disclosed embodiments using a proxy agent, which "acts both as a server and a client by accepting requests from client browsers," by instead requiring that a response be "to the web page request from the user browser."  *See id.* at 4:39-54; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that construction that excludes preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support").  There is no such requirement in the claims, even with respect to the "rewritten URL." For example, Claim 6 of the '416 Patent only requires a "rewritten URL" embedded in a response "*such that* a browser request to each of the rewritten embedded URLs is sent to the tracking system."  Defendant's proposal should further be rejected on this basis.

Finally, Defendant's proposed rewriting of the claim terms would only add ambiguity by departing from the patentee's readily understood claim language.  Based on their identification of

extrinsic evidence, Defendant's construction somehow relies on the definition of a "non-transparent proxy" in the RFC 2616 reference (Ex. D) and other unrelated definitions in The Authoritative Dictionary of IEEE Standards Terms (Seventh Edition) (December 1, 2000) (Ex. E). Notably, the term "original URL" is not defined in either reference, and it is unclear how the unrelated definitions in that reference even feature in Defendant's construction. Defendant's reliance on extrinsic references without any legitimate basis should be rejected, particularly as Defendant's construction is inconsistent with their own references. Defendant's proposal should, therefore, further be rejected on this basis.

Defendant's construction should therefore be rejected, and this term should be given its plain and ordinary meaning.

>    iii.    **"[[at least one]] a rewritten URL" / "the rewritten URL" / the rewritten embedded URL[[s]]" / "[[Each of ]] the rewritten embedded URL[[s]]" (Claims 1 and 6 of the '416 Patent and Claims 1 and 17 of the '946 Patent)**

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "[a / the] URL replacing the URL embedded in the response to the Web page request from the user browser" |

The term "rewritten URL" (and/or its variants) appears in Claims 1 and 6 of the '416 Patent and Claims 1 and 17 of the '946 Patent. For example, Claim 1 of the '416 Patent recites "providing the user browser with a Web page containing a URL specifying both an address of the tracking system and information that specifies a URL on the Web server . . . determining a Web server URL from the Web page request . . . identifying and extracting captured information indicating that the user browser has requested the Web server URL . . . encoding an original URL as part of the tracking system URL path *to construct at least one rewritten URL*; embedding the *rewritten*

11

*URLs* in the response such that a browser request *to each of the rewritten embedded URLs* is sent to the tracking system; and causing the Web page specified by the Web server URL to be returned to the user browser." Ex. A, Claim 1.  Similarly to the term "original URL" discussed above, a POSITA, and for that matter a lay juror, would readily understand the plain and ordinary meaning of this term to refer to, for example, a URL constructed based on the tracking system without the need for construction.  Defendant again improperly seeks to rewrite this term without any legitimate basis, and improperly deviates from the plain and ordinary meaning in the absence of any lexicography or disclaimer.  Defendant's proposal should be rejected for many of the same reasons as discussed above with respect to the "original URL" term.

First, the term "rewritten" has a readily understood plain-English meaning in the context of the claims that a POSITA and even a lay juror would understand including, for example, a "rewritten URL" associated with a web server and embedded in a response.  *See* Ex. A, Claim 1. The plain and ordinary meaning of "rewritten URL" is also readily understood based on the context of dependent claims, which recite various forms of information that may be present in sessions recorded by a rewritten URL. *See e.g.* Ex. B, Claim 9 ("wherein the apparatus causes the generation of the purchase summary by operations that return a category code and a source code referral parameter *for the sessions recorded by the rewritten embedded URLs*"). Defendant fails to identify any lexicography or disavowal that would warrant a departure from that plain and ordinary meaning or would justify its reliance on extrinsic evidence.  S*ee Hill-Rom Servs.,* 755 F.3d at 1371 ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal.") (citations omitted).

Second, similar to the "original URL" term, Defendant's proposed construction would impermissibly narrow claim scope, and would add ambiguity to the claims by rewriting terms with

superfluous and unclaimed language.  For example, Defendant seeks to strictly limit a "rewritten URL" to one "*replacing* the URL embedded in the response to the web page request *from the user browser*."  There is no such limitation in the claims.  For example, Claim 1 of the '416 Patent merely requires "embedding the rewritten URLs in the response *such that a browser request to each of the rewritten URLs is sent to the tracking system*."  As a further example, the specification discloses embodiments in which "[t]he URL-proxy works by rewriting URLs such that the original URL is encoded as part of the path of the proxy URL." Ex. A, 6:18-20.  There is no requirement that the "rewritten URL" needs to be something that "replaces a URL embedded in a response" *(e.g.,* as opposed to being rendered with a new page).  Moreover, similar to the "original URL" term discussed above, Defendant's construction effectively reads out embodiments using proxy agents by requiring a request to come directly "from the user browser."  Defendants' proposal should further be rejected on these bases.

Finally, Defendant improperly identifies extrinsic evidence, including The Authoritative Dictionary of IEEE Standards Terms (Seventh Edition) (December 1, 2000) (Ex. E) which neither supports its construction nor even provides a definition of "URL."  As discussed above, Defendant's construction should further be rejected for this improper reliance on extrinsic evidence.

Defendant's construction should therefore be rejected, and "rewritten URL" should be given its plain and ordinary meaning. *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337 (Fed. Cir. 2008).

iv.   **"form[ing]   parameter   data   based   upon   predetermined selection parameters from the database" (Claims 1 and 6 of the '416 Patent and Claims 1 and 17 of the '946 Patent)**

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

The term "form[ing] parameter data based upon predetermined selection parameters from the database" appears in every asserted independent claim.  For example, Claim 1 of the '416 Patent recites: "identifying and extracting captured information indicating that the user browser has requested the Web server URL, the captured information stored within a database; ***forming parameter data based upon pre-determined selection parameters from the database***; encoding an original URL as part of the tracking system URL path to construct at least one rewritten URL . . . ."  This term does not require construction as a POSITA would understand its meaning with reasonable certainty from its context in the claims and based on the specification. Ex. C, ¶¶ 38-41. Dr. Omid Kia's expert opinion that this term is definite are unrebutted. Accordingly, Defendant's proposal should be rejected.

First, the claim language plainly recites that a "predetermined selection parameter" is a predetermined parameter from which "parameter data" is formed, and which is "from the database" in which "captured information indicating that the user browser has requested the Web server URL" is stored.  There is nothing challenging regarding the plain English meaning of these terms to a POSITA, or even to a lay juror.  A POSITA would therefore be reasonably certain as to the meaning of a "predetermined selection parameter" based on the context of the claims alone.

Second, even if there were some ambiguity regarding this term (there is not), the specification provides extensive detailed discussion of embodiments of parameter data which are formed based on predetermined selection parameters.  Ex. C, ¶¶ 38-41.  Based on this disclosure,

a POSITA would readily understand various embodiments of "predefined selection parameter" to include user-defined parameters of a given website to be tracked (*e.g.* as parameter data), such as "the purchase date, the time at which the purchase occurred, the site of the purchase, the name of the purchased item, the unit price of the item, the quantity, the total price, a user identifier, and the credit-card type" in the context of e-commerce. Ex. A, 16:3-9.  For example, the specification discloses that embodiments of a system for reporting online activity may "associate[] each page record to an event type based on user-defined parameters, identif[y] and extract[] user-defined attributes of each page record based on its event type, and report[] on the occurrence of the event." *Id.*, 4:11-25.  The specification further details "parse-attribute objects" which may be extracted based on "user-defined parse-methods associated with the matching site-page," which "expresses the type of algorithm and any algorithm-specific parameters to be used for extracting attribute data from an identified-page record." *Id.* at 11:41-47.  A POSITA would recognize that "predetermined selection parameters" further include such "user-defined parse methods."  Ex. C, ¶ 39; *see also* FIG. 3 (reproduced below) (annotations added).



FIG. 3 Data Identification and Extraction Entities

The specification goes on to explain that in the context of online activity, such as "purchases from the sale of goods and services online, online shopping cart abandonment, airline ticket reservations, credit card type usage, user account creation, and contest or sweepstake entries[, t]he present invention provides event specific attributes such as purchase amounts, cart item names, travel dates, e-mail addresses and zip codes." *Id.* at 5:28-39. The specification further discloses "predetermined selection parameters," such as "user-defined parameters used by the identification, extraction and analysis modules to: identify the site for a logged-page record; associate logged-page records with site-pages; associate site-pages with event triggers, event pre-triggers, and parse-methods. *Id.* at 18:15-19. As yet another example, the specification discloses embodiments in which "referral parameters," (*e.g.* "user-defined parameters that may be used to logically group and query report data") are encoded "within the rewritten URL" to be sent to a tracking system. *Id.* 6:60-67. Thus, as noted in Dr. Kia's unrebutted opinion, the specification would further reinforce a POSITA's understanding of this term without the need for construction. Ex. C, ¶ 39.

Accordingly, Defendant's position should be rejected as this term would be reasonably clear to a POSITA. Defendant cannot carry its burden to show indefiniteness by clear and convincing evidence.

> v. **"dynamically maintain[ing] the predetermined selection parameters based upon revisable, operator-defined instructions on how to select and extract information from a text page; and analyzing the parameter data sets to predict future user activity" (Claims 5 and 10 of the '416 Patent)**

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term does not require construction as a POSITA would understand its meaning with

reasonable certainty from its context in the claims and based on the specification.  Ex. C, ¶¶ 38-41. Dr. Kia's expert opinion that this term is definite are similarly unrebutted. Accordingly, Defendant's indefiniteness arguments should be rejected.

As discussed above at **Section iv**, a POSITA would understand the scope of the term "predetermined selection parameters" with reasonable certainty.

The remainder of this term would be similarly clear to a POSITA in the context of the claims and based on the specification.  Ex. C, ¶¶ 42-48.  There is no ambiguity in the plain English recitation of maintaining parameters "dynamically maintaining . . . based upon revisable, operator-defined instructions on how to select and extract information from a text page" or "analyzing the parameter data sets to predict future user activity."  Ex. A, Claim 5. To the extent that Defendant even contends these portions of the claim term are indefinite, the context of the claim language makes it reasonably clear to a POSITA that the term requires: (1) that "predetermined selection parameters" be dynamically maintained based on instructions on how to "select and extract information from a text page" chosen by an operator; and (2) that the "parameter data" formed based on such predetermined selection parameters is analyzed to "predict future user activity." *Id.* The specification's disclosure of a "profile management module" with a graphical user interface that "provides interfaces for creating, amending and deleting sites . . . event-types, attributes, identification-methods and parse-methods" would further reinforce a POSITA's clear understanding of these terms.  *Id.* at 16:60-17:4; *see also* Ex. C, ¶ 44.  As a further example, a POSITA would understand that the specification would reinforce a POSITA's understanding of "dynamically maintaining predetermined selection parameters" by disclosing examples of "user-defined parse-methods" which express "the type of algorithm and any algorithm specific

parameters to be used for extracting attribute data from an identified-page record." Ex. A at 11:41-47.

Accordingly, Defendant's position should be rejected as this term would be reasonably clear to a POSITA.   Defendant cannot carry its burden to show indefiniteness by clear and convincing evidence.

> vi.   **"[[the]] a response" / "[[a]] the response" / "embedding the rewritten URLs in [[the]] a response" / "receiving [[a]] the response from Web server" / "forwarding the response to the user browser" (Claims 1, 2, 6, and 7 of the '416 Patent and Claims 1, 10, 17, and 25 of the '946 Patent)**

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "[a / the] response to the Web page request from the user browser"<br><br>"forwarding the response from the Web server as the response to the Web page request from the user browser" |

The terms "[a / the] response," "embedding the rewritten URLs in [[the]] a response," or "forwarding the response to the user browser" appears in Claims 1, 2, 6, and 7 of the '416 Patent and Claims 1, 10, 17, and 25 of the '946 Patent.   A POSITA would understand these terms to have their plain and ordinary meanings without the need for construction.   *Hill-Rom Servs.,* 755 F.3d at 1371.   Defendant apparently contends that these terms should be collectively defined and must be limited to "[a / the] response to the Web page request from the user browser" and "forwarding the response from the Web server as the response to the Web page request from the user browser." But Defendant cannot justify its deviation from the plain and ordinary meaning and narrowing of these terms.   Defendant's proposal should therefore be rejected.

Defendant fails to identify any lexicography or disclaimer with respect to any "response"

term.  *See id.* at 1371 ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal.") (citations omitted).  Indeed, the meaning of the claimed "responses" is apparent based on the context of the claims.  For example, Claim 1 of the '416 Patent recites "upon receipt by the tracking system of a Web page request from the user browser, determining a Web server URL from the Web page request . . . encoding an original URL as part of the tracking system URL path to construct at least one rewritten URL; embedding the rewritten URLs in ***the response*** such that a browser request to each of the rewritten embedded URLs is sent to the tracking system."  Based on the plain language of Claim 1 of the '416 Patent, the required "response" includes an embedded URL, and is provided such that browser requests to the rewritten URLs are directed to the tracking system.  There is no requirement that the response be directly to or from a browser, as Defendant suggests.  Any such requirement would read out disclosed embodiments using a proxy agent, which "acts both as a server and a client by accepting requests from client browsers."  Ex. A at 4:39-54.  Accordingly, Defendant's proposal should be rejected as improperly deviating from the plain and ordinary meaning of the claim terms, and as improperly narrowing the scope of the claims.

Defendant's improper attempt to rewrite the claim language also adds ambiguity and unnecessary superfluous language.  For example, while the Asserted Claims use the term "response" in the context of embedded URLs ultimately provided ***to*** a browser, Defendant's construction would require a response "***from*** the user browser."  As yet another example, Defendant's proposal reads in various requirements for a response "from the web page server" and "to the web page request from the web page server."  Similar claim language is already present in certain dependent claims, such as Claim 7 of the '416 Patent and is unnecessary to import into a definition of response.  Moreover, where independent claims lack such limitations, Defendant's

proposal further appears to reflect an attempt to establish a non-infringement position by creating a distinction between a response from a "tracking system" and a "web server."  Defendant's proposal should further be rejected on this basis.

Accordingly, Defendant's construction should be rejected, and these claim terms should be given their plain and ordinary meaning.

### vii. "provide profiling and analysis of at least one session" (Claims 1 and 17 of the '946 Patent)

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

The term is recited in independent Claims 1 and 17 of the '946 Patent.  Plaintiff submits that this term would be reasonably clear to a POSITA and does not require construction. Ex. C, ¶¶ 49-60.  Dr. Kia's expert opinion that this term is definite are unrebutted. Moreover, this term relates to a central aspect of the claimed invention and Defendant's indefiniteness position strains credulity.  Defendant cannot carry its burden to show indefiniteness by clear and convincing evidence, and its proposal should be rejected.

As an initial matter, there is nothing ambiguous about the term, "provide profiling and analysis of at least one session" in the context of "a system and method for tracking and reporting online activity."  *See* Ex. B at Abstract.  A POSITA would thus have a reasonably clear understanding of what it means to profile and analyze a session (*e.g.* a browser session) based on the claim language alone.  Ex. C, ¶¶ 51-60.  Dependent Claims 2, 3, and 18-20 would further provide a POSITA with context as to operations within the scope of "profiling" (*e.g.* identifying a site, associating a logging page record with the site, and associating at least one site page with event triggers, event pre-triggers, and parse methods) and "analysis (*e.g.* "reporting at least one

20

of the following: a session detail of the session; an event detail of an event; a purchase detail of a purchase; and a purchase summary of a purchase.").  Accordingly, to the extent there is any ambiguity in the first place, the claim language itself would give a POSITA reasonable certainty as to the scope of this term.

The specification would further reinforce a POSITA's understanding of this term.  One of the primary objects of the invention of the '946 Patent is to provide "a system and method for tracking and reporting online activity . . . which provides a highly configurable, data-driven capability to track and report online activity." Ex. B at 4:10-16.  For example, an "Event Tracking System (ETS) embodying an aspect of the present invention effectively reports on many different types of known online activity and data including, but not limited to: purchases from the sale of goods and services online, online shopping cart abandonment, airline ticket reservations, credit card type usage, user account creation, and contest or sweepstake entries."  *Id.* at 4:32-38. The '946 Patent specification goes on to disclose detailed embodiments, including pseudocode and algorithms, in which browser sessions are profiled and analyzed.  *See e.g. id.* at 12:21-25 ("the data analysis module 140 consists of three components responsible for session analysis 141. . . ."); *id.* at 12:57-62 ("the session analysis algorithm groups logged-pages by browser and log date.  The session analysis algorithm groups consecutive logged-pages from the same browser under the same session if the elapsed time between logged-pages are within 30 minutes of each other. . . ."); *see also* Table 3 (providing "a pseudo-code description of the real-time session analysis algorithm according to the present invention").

Accordingly, Defendant's position should be rejected as this term would be reasonably clear to a POSITA.  Defendant cannot carry its burden to show indefiniteness by clear and convincing evidence.

> viii. **"3. The method of claim 1, where the causing the Web page specified by the Web server URL to be returned to the user comprises redirecting the user browser to the Web page on the Web browser" / "8. The apparatus of claim 6, where the apparatus causes the Web page specified by the Web server URL . . ." / "11. The apparatus of claim 1, where the apparatus causes the Web page specified by the Web server URL . . ." / The method of claim 17, wherein the Web page specified by the Web server URL . . ." (Claims of the '3 and 8 of the '416 Patent and Claims 11 and 26 of the '946 Patent)**

| Network Monitoring's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "responding with a redirect code that causes the browser to automatically send a second request to the tracking system, this time causing the Web page specified by the Web server URL to be returned to the user" |

Claims 3 and 8 of the '416 Patent and Claims 11 and 26 of the '946 Patent recite the term "[causing /causes] the Web page specified by the Web server URL to be returned to the user comprises redirecting the user browser to the Web page on the Web browser." *Howmedica Osteonics Corp.*, 540 F.3d at 1347. Defendant improperly proposes that this limitation should be rewritten as "responding with a redirect code that causes the browser to automatically send a second request to the tracking system, this time causing the Web page specified by the Web server URL to be returned to the user." But a POSITA would understand this term to have its plain and ordinary meaning, without the need for further construction. Accordingly, Defendant's construction should be rejected.

Defendant's proposal is a naked attempt to import aspects of specification embodiments into the claims. *See* Ex. A at 14:17-26 ("When a site receives a request to execute a transaction, it responds with a redirect code. The redirect code causes the browser to automatically send a second request, this time retrieving the transaction confirmation page."); *see also id.* at Table 4. But it is axiomatic that claim language is not limited to narrower specification embodiments. *Supherguide*

*Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.").  Defendant has no basis for importing aspects of specification embodiments into the claims, and its proposal should be rejected on this basis.

Defendant's proposal is also improper for deviating from the plain and ordinary meaning of the claim terms in the absence of any lexicography or disavowal.  *Hill-Rom Servs.,* 755 F.3d at 1371 ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal.") (citations omitted).  In addition to importing aspects of specification embodiments, Defendant improperly rewrites readily understandable claim terms (*e.g.* "redirecting the user browser") to recite additional limitations for "this time causing the Web page specified by the Web server URL to be returned to the user."  But a "redirect" (*e.g.* based on a rewritten web server URL) is readily understandable to a POSITA.  Moreover, Defendant's proposal appears to require multiple separate attempts to access a given URL in order to qualify as a claimed "redirect."  Defendant's proposal should further be rejected on that basis.

Defendant's construction should be rejected, and these claim terms should be given their plain and ordinary meaning.  *Howmedica Osteonics Corp.*, 540 F.3d at 1347.

## III.    CONCLUSION

For the foregoing reasons, Network Monitoring respectfully requests that the Court adopt its proposed constructions for the disputed terms and phrases of the Asserted Patent.

Dated:  April 6, 2022                                  Respectfully submitted,

                                                                    /s/ *Vincent J. Rubino, III*
                                                                    Alfred R. Fabricant
                                                                    NY Bar No. 2219392
                                                                    Email: ffabricant@fabricantllp.com
                                                                    Peter Lambrianakos

NY Bar No. 2894392
Email: plambrianakos@fabricantllp.com
Vincent J. Rubino, III
NY Bar No. 4557435
Email: vrubino@fabricantllp.com
**FABRICANT LLP**
411 Theodore Fremd Avenue, Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

Justin Kurt Truelove
Texas Bar No. 24013653
Email: kurt@truelovelawfirm.com
**TRUELOVE LAW FIRM, PLLC**
100 West Houston Street
Marshall, Texas 75670
Telephone: (903) 938-8321
Facsimile: (903) 215-8510

***ATTORNEYS FOR PLAINTIFF***
***NETWORK MONITORING LLC***

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on April 6, 2022, a true and correct copy of the above

and foregoing document has been served on counsel of record via the Court's CM/ECF system per

Local Rule CV-5(a)(3).

*/s/Vincent J. Rubino, III*
Vincent J. Rubino, III