**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| NETWORK MONITORING LLC, | |
| *Plaintiff*, | Civil Action No. 2:21-cv-00148-JRG |
| v. | JURY TRIAL DEMANDED |
| SKYSCANNER LTD., | |
| *Defendant*. | |

## SKYSCANNER LTD.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................................1

II.    THE ASSERTED PATENTS .....................................................................................1

III.   ACCUSED INSTRUMENTALITIES .......................................................................4

IV.   LEGAL STANDARD...............................................................................................4

     A.     Definiteness under 35 U.S.C. § 112, ¶ 2.......................................................4

     B.     Indefiniteness under 35 U.S.C. § 112, ¶ 2 ....................................................5

V.    DISPUTED CLAIM TERMS ...................................................................................6

     A.     Contested Term No. 0: Ordered Combination.................................................6

     B.     Contested Term No. 1: "an original URL" ......................................................9

     C.     Contested Term No. 2: "[[at least one]] a rewritten URL" / "the
             rewritten URL" ..............................................................................................12

     D.     Contested Term No. 3: "form[ing] parameter data based upon
             predetermined selection parameters from the database" .................................13

     E.     Contested Term No. 4: "dynamically maintain[ing] the predetermined
             selection parameters based upon revisable, operator-defined
             instructions on how to select and extract information from a text page;
             and analyzing the parameter data sets to predict future user activity" ............15

     F.     Contested Term No. 5: "[[the]] a response" / "[[a]] the response" /
             "embedding the rewritten URLs in [[the]] a response" / "receiving [[a]]
             the response from Web server" / "forwarding the response to the user
             browser"........................................................................................................16

     G.     Contested Term No. 6: "provide profiling and analysis of at least one
             session" .........................................................................................................17

     H.     Contested Term No. 7: "3. The method of claim 1, where the causing
             the Web page specified by the Web server URL to be returned to the
             user comprises redirecting the user browser to the Web page on the
             Web browser" / "8. The apparatus of claim 6, where the apparatus
             causes the Web page specified by the Web server URL . . ." / "11. The
             apparatus of claim 1, where the apparatus causes the Web page
             specified by the Web server URL . . ." / The method of claim 17,
             wherein the Web page specified by the Web server URL . . ." .......................18

VI.   CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)......................................................................... 10

*Eon Corp IP Holdings LLC v Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2016)........................................................................... 1

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*,
  93 F.3d 766 (Fed. Cir. 1996).............................................................................. 8

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016)........................................................................... 4

*Homeland Housewares, LLC v. Whirlpool Corp.*,
  865 F.3d 1372 (Fed. Cir. 2017)........................................................................... 9

*Hormone Research Found., Inc. v. Genentech Inc.*,
  904 F.2d 1558 (Fed. Cir. 1990)........................................................................... 4

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)...................................................................... 8, 10

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
  764 F.3d 1392 (Fed. Cir. 2014)........................................................................... 7

*Nautilus, Inc. v. BioSig Instruments, Inc.*,
  572 U.S. 898 (2014).................................................................................*passim*

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008).................................................................*passim*

*In re Packard*,
  751 F.3d 1307 (Fed. Cir. 2014)......................................................................... 14

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................................................. 4, 19

*TF3 Ltd. v. Tre Milano, LLC*,
  894 F.3d 1366 (Fed. Cir. 2018)......................................................................... 12

*Trs. of Columbia Univ. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016)........................................................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)........................................................................... 20

**Federal Statutes**

37 C.F.R. § 1.75(d)(1).........................................................................................................5

35 U.S.C. § 112, ¶ 2 .......................................................................................................4, 5

## I.  INTRODUCTION

The Court should reject Network Monitoring's proposed claim constructions and adopt Skyscanner's proposals. Network Monitoring's contention that they merely propose the "plain and ordinary meaning" is belied by their unsupported interpretations of the plain and ordinary meaning of each of the claim terms. Simply finding that all of the disputed terms have their "plain and ordinary" meaning will therefore not resolve any disputes—rather, it will multiply the issues at trial. *See Eon Corp IP Holdings LLC v Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) ("During claim construction, the parties actively disputed the scope of the 'portable' and 'mobile' terms . . . . By determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error."); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

At bottom, Network Monitoring proposes that the Court allow the claims to be interpreted in ways that broaden the claims beyond their plain language to recapture prior art distinguished in the specification, confuse the jury, and render the "preferred embodiment" inoperable. Skyscanner's proposed constructions are grounded in the claim language and the patentee's description of the "present invention" and clarify their meaning for the jury.

## II.  THE ASSERTED PATENTS

Asserted U.S. Patent Nos. 9,058,416 and 9,680,946 are directed to a "system and method for tracking and reporting online activity across a plurality of clients and servers." *See, e.g.,* '416 Patent, Title, Abstract, and 1:15–23. The purported problem stems from the fact that online activity is conventionally transactional. That is, a user's online session was typically

based upon direct communications between a single web browser and a website. *Id.* at 1:41–2:6. For example, a user may click a link on a web page, in which a URL directs the web browser to the address of the web server. *Id.* The web server responds with a web page which may have more links to the website, allowing the user to continue a conversation directly with the web site. *Id.* However, the user may visit multiple other websites during the session. *Id.* at 2:16–24. Because each website has its own direct connection to the web browser, tracking these conversations for multiple web sites requires another approach. *Id.* at 2:16–24.

The patent discusses and distinguishes several of these alternative approaches. The first, client metering, required an installation on a client web browser and allegedly cannot capture secure (i.e., SSL) web transactions. *Id.* at 2:25–51. Another involves analyzing web server log files. *Id.* at 2:52–67. But this approach was limited to tracking access of one web site and allegedly can capture only limited data. *Id.* Another tracking method was the insertion of JavaScript or transparent images into web page, which acted as a "beacon" to report back to the tracking system. *Id.* at 3:21–30. But this required each website to modify their system. *Id.* Finally, there is the "affiliate" approach. *Id.* at 3:1–20. Each website individually reports transaction data to a centralized repository. But, again, this required engineering each individual website, and cannot access data not affiliated with the network. *Id.*

The patented approach is simply to have a tracking server operate as an intermediary between the client web browser and third-party websites. The claimed tracking system "intercepts and logs secure and non-secure HTTP request and response pages, analyzes each of the received page records," performs further data identification, extraction, and reporting of the web page transmissions. *Id.* at Abstract. The architecture of the "the present invention" includes a data capture module, which is described as follows:

> The data capture module is responsible for: ***providing a means by which it can intercept client-server HTTP transmissions***; decrypting SSL encrypted transmissions when applicable; ***recording the entire, non-encrypted HTTP request and response on a storage device***; and recording other data related to

the transmission, such as the identity of the requesting client, the URL for the request, and the time at which the transmission occurred.

(*Id.* at 5:54–64.)

In the preferred embodiment, the data capture module is implemented as a conventional "URL-rewriting proxy agent … to capture client-server transmissions for the purpose of reporting online activity." (*Id.* at 5:65–6:8.) The URL-proxy works by providing URLs such that the original website's URL is encoded as part of the path of the proxy URL. (*Id.* at 6:9–20.) Thus, when a user clicks a link on the web page, this rewritten URL directs the web browser to the URL-proxy, rather than to the web site. The proxy then extracts the original URL from the path of the rewritten URL, sends a request to the original website host, receives the response from the original website host, and the URL-proxy serves the web site's response data to the client browser. (*Id.* at 6:21–31.) The patent explains the benefit of this approach:

> A proxy agent acts both as a server and a client by accepting requests from client browsers, initiating requests to Web servers on behalf of the clients, receiving responses from Web servers, and forwarding the responses back to the client browsers. As such, a proxy agent is an ideal central point wherein client-server transmissions across a plurality of clients and servers may be captured and recorded.

(*Id.* at 4:47–54.)

The proxy does not forward the website's response to the client browser in its original form. Without modification its links would direct the user to the website and not back to the proxy, preventing the proxy from intercepting future requests and responses. Thus, the URL-proxy rewrites all URLs embedded in the response HTML code before sending it back to the client web browser. (*Id.* at 6:21–31.) "In this manner, the URL-proxy is able to intercept further requests initiated by the browser as a result of the user clicking on hyperlinks that reference the rewritten URLs." (*Id.*)

## III.     ACCUSED INSTRUMENTALITIES

The accused instrumentality is Skyscanner's travel search website at www.skyscanner.com. There, customers can search for and book flights, hotels, and car rentals. For some search results, Skyscanner's website provides a "Go to site" button on the web page with a link to another website. Clicking on the button will cause Skyscanner's website to direct the customer's web browser to the third-party website where the user completes their transaction. The customer's web browser does not return to Skyscanner's website.

## IV.     LEGAL STANDARD

The words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. Accordingly, "the only meaning that matters in claim construction is the meaning in the context of the patent." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). "[W]hen a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (citations omitted). Consequently, "[i]t is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer." *Hormone Research Found., Inc. v. Genentech Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990).

### A.     Definiteness under 35 U.S.C. § 112, ¶ 2

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "The claim or claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in

the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." 37 C.F.R. § 1.75(d)(1). When read in light of the intrinsic evidence, the claim must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. BioSig Instruments, Inc.*, 572 U.S. 898, 909- 10 (2014). "[The] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.' *Id*. at 909 (alteration in original) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)). "Otherwise there would be '[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'" *Id*. at 909-10 (alteration in original) (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)). If the claim fails to provide such precision and certainty, the claim is invalid and indefinite. *Id*. at 901. As it is a challenge to the validity of a patent, the failure of a claim to comply with § 112 must be shown by clear and convincing evidence. Id. at 912 n.10.

**B.     Indefiniteness under 35 U.S.C. § 112, ¶ 2**

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "The claim or claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." 37 C.F.R. § 1.75(d)(1). When read in light of the intrinsic evidence, the claim must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. BioSig Instruments, Inc.*, 572 U.S. 898, 909-10 (2014). "[The] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Id*. at 909 (alteration in original) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)). "Otherwise there would be '[a] zone of uncertainty which enterprise and

experimentation may enter only at the risk of infringement claims.'" *Id.* at 909-10 (alteration in original) (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)). If the claim fails to provide such precision and certainty, the claim is invalid and indefinite. *Id.* at 901. As it is a challenge to the validity of a patent, the failure of a claim to comply with § 112 must be shown by clear and convincing evidence. *Id.* at 912 n.10.

## V.    DISPUTED CLAIM TERMS

### A.    Contested Term No. 0: Ordered Combination

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner's Construction |
|---|---|---|
| '416 Patent: claims 1 and 6<br><br>'946 Patent: claims 1 and 17 | Plain and ordinary meaning: No required ordering | These claims require a specific ordered combination:<br>1) "providing the user browser with a Web page containing a URL . . ."<br><br>2) "determining a Web server URL . . ."<br><br>3) "identifying and extracting";<br><br>4) "forming parameter data";<br><br>5) "encoding an original URL as part of the tracking system URL"<br><br>6) "embedding the rewritten URLs in the response . . ."<br><br>7) "causing the Web page specified by the Web server URL to be returned to the user browser." |

The parties dispute whether the claims require an ordered combination. Specifically, the claims recite an order necessary to describe the proxy architecture of "the present invention" that intercepts a web request and response and rewrites URLs in the response to cause future requests to be intercepted. ('416 Patent at 5:54–6:31.) Without this order, the claims do not

make logically or grammatically make sense and would fail to capture the intercepting architecture of "present invention."

First, "[t]he claim language [of the independent claims], as a matter of logic or grammar, requires that the steps be performed in the order written." *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014). For example, in Claim 1 of the '416 Patent, each step grammatically or logically depends upon a previous step and requires that the previous step has already occurred:

- The step of "determining a Web server URL from the Web page request" cannot occur until the "receipt by the tracking system of a Web page request from the user browser" ('416 Patent at 23:25–26), which further requires that "a URL specifying both an address of the tracking system and information that specifies a URL on the Web server" is "provid[ed]." *Id.* at 23:23–24.

- The step of "identifying and extracting captured information that the user browser has requested the Web server URL" and "stor[ing] the captured information" cannot occur without first "providing . . . a URL" and "determining a Web server URL from the Web page request." *Id.* at 23:26–27.

- "[F]orming parameter data . . . from the database" cannot happen without first "stor[ing] the captured information within [the] database."

- The step of "encoding an original URL" requires that a user "providing the user browser with a Web page containing a URL." *Id.* at 23:22–23. The step of "embedding the rewritten URLs in the response" requires that a URL is "rewritten." *Id.* at 23:35–36.

- The step of "causing the Web page specified by the Web server URL to be returned to the user browser" requires that the "Web server URL" is "determin[ed]." *Id.* at 23:38–39.

Thus, the plain logic and grammar of the claim language require the sequential relationship between the steps. This same logical sequence of steps holds true for other independent method and system claims in the Asserted Patents, each with claim language that closely mirror the cited language from the '416 Patent discussed above.

The sequential order of the claim elements is also necessary for comprehension of the antecedent basis of the claim terms. For example, Claim 1 of the '416 Patent describes a tracking system "**providing** the user browser with **a** Web page containing a URL specifying

… **a** URL on the Web server." The next step claims "**determining a** Web server URL from **the** Web page request." The claimed process completes by "**causing the** Web page specified by **the** Web server URL to be **returned** to the user browser." If the step of "providing the user browser with a Web page" did not occur first, it would be rendered superfluous because it would be equivalent to the last step of "**causing the** Web page specified by **the** Web server URL to be **returned** to the user browser." It only receives meaning when it is the first step providing a URL by which the user can initiate the rest of the claimed process by sending a first request to the tracking system. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting the district court's claim construction because it rendered superfluous the claim requirement for openings adjacent to the end walls).

The specification confirms that claims were written in their order to follow the sequential steps for the "logical workflow" of a proxy-based system. The patent explicitly states that "[t]he system and method of the present invention employs URL-proxies to capture client-server transmissions for the purpose of reporting online activity." (*Id.* at 6:5–7.) The only embodiments described a proxy-based system that follows the recited order, which begins with the web browser sending a request intercepted by the tracking system, followed by capturing data in the transmission and other processing, and ends with the tracking system returning the responsive web page with URLs rewritten to point back to the tracking system rather than the third-party website. It is "[i]n this manner [that a] URL-proxy is able to intercept further requests initiated by the browser as a result of the user clicking on hyperlinks that reference the rewritten URLs." (*Id.*)

Network monitoring wrongly suggests that the phrase "upon receipt by the tracking system of a Web page request" implies that the patentee could have explicitly recited an order,

but did not. That phrase refers to an event that is not otherwise recited as a claim step, so it makes sense that the patentee must specify where that event falls in the recited order of steps.

Every Asserted Patents' independent claims require a sequential order of each of the claim elements "as a matter of logic or grammar" and should be construed accordingly.

**B.      Contested Term No. 1: "an original URL"**

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner's Construction |
|---|---|---|
| '416 Patent: Claims 1 and 6<br><br>'946 Patent: Claims 1 and 17 | Plain and ordinary meaning | "a URL embedded in the response to the Web page request from the user browser" |

The parties dispute the plain and ordinary meaning of an "original URL" and its related claim limitation "rewritten URL." Skyscanner requests the Court construe this term to provide the jury guidance in the proper understanding of this claim term in light of the intrinsic record. *See O2 Micro*, 521 F.3d at 1361-63. The term "original URL" should be construed as a URL that is "original" because it was the URL originally embedded in the response to the Web page request from the user browser, before being "rewritten" and sent to the web browser. This is how a proxy-based system like that employed by the "present invention" operates. Skyscanner's proposed construction clarifies and gives context to the claim element.

The analysis begins with the claim language itself. *See Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) ("The claim construction inquiry … begins and ends . . . with the actual words of the claim."). For example, "upon receipt by the tracking system of a Web page request from the user browser," the tracking system performs the step of "encoding **an original URL** as part of the tracking system URL path to construct at least one **rewritten URL**," which then "embed[ded] … in the response." '416 Patent at Claim 1. (emphasis added). To **rewrite** a URL, there must have been previously **written** URL. As seen by the claim language, the original URL was previously written by being originally

"embedded" in the Web page response. (*See id.* at 6:18–20 ("[T]he URL-proxy first rewrites **all URLs embedded** in the HTML code in the manner described above before sending the response back to the browser.").).

The specification further supports Skyscanner's construction. It explains how rewriting the original URL embedded in the response so that it points to the proxy-based tracking system, instead of to the Web site, allowing for interception of the next request by the tracking system: "The **rewritten URL** causes the browser to send a request to URL-proxy. The proxy then extracts the **original URL** from the path of the rewritten URL, sends a request to the original host, receives the response from the original host and serves the response data to the browser." '416 Patent at 6:21–25 (emphasis added). Reading that in context with the claim term, it demonstrates that the "original URL" is the URL embedded in original Web page response received from the Web site, before the tracking system changes the URL in the response and forwards the modified response to the user's web browser.

Network Monitoring wrongly contends that a POSITA would understand that the plain and ordinary meaning refers back to a URL encoded as part of the tracking system without the need for construction. (Opening Br. at 9.) It does not refer to **just any** "URL encoded as part of the tracking system," as Network Monitoring suggests. This would remove "original" from the phrase "original URL." *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (rejecting proposed construction that reads an element out of the claim). Skyscanner's proposed construction clarifies and gives meaning to "original" because it was the URL originally embedded before being "rewritten." The patentee could have alternatively described these URLs as a "first" URL and a "second" URL. But he did not—he chose "original" and "rewritten." *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Network Monitoring also tries to confuse the issue by suggesting that Skyscanner's proposed construction narrows the term to "require that *every* original URL encoded by a tracking system be embedded in a response." (Opening Br. at 10.) It is not clear what Network Monitoring is trying to say. If it is suggesting that every URL encoded in the original web page response must be rewritten, it is wrong. The specification explains that some URLs in the original response, like those pointing to images, would not need to be rewritten to point to the tracking system. ('416 Patent at 6:32–37.) Skyscanner's proposed construction allows for other URLs like images to remain in their original form. If Network Monitoring is suggesting that every "original URL" that is "rewritten" must be one that was originally written, well, yes, that is what the plain and ordinary meaning of "rewritten" means.

Network Monitoring's suggestion that Defendant's proposed construction reads out proxy embodiments is wrong. (Opening Br. at 10.) It is only Defendant's proposed construction that follows the operation of the proxy-based system of the "present invention." A proxy-based system "rewrites all URLs embedded in the HTML code" of the "response from the original host." ('416 Patent at 6:25–31.) On the other hand, Network Monitoring's suggestion that an "original URL" can be any URL would capture any website that directs a web browser to a third-party website upon receiving a request, including prior art "affiliate networks" that do not use a proxy-based system (*Id.* 3:1–20 (citing U.S. Patent No. 5,991,740).) Prior art affiliate networks also operated by using URLs that were directed to a tracking server, but also which also containing encoded URL information for a merchant web server. (*See* Ex. 1, '740 Patent at 8:23–67, Table 1, Fig. 6.) In the exemplary prior art '740 Patent, which was distinguished in the specification, a "banner ad is linked, first in a seamless fashion to the Clearinghouse[]. The link then continues directly to the Merchant[]" (*Id.* at 8:52–64.). Accordingly, the user was directed to access the Clearinghouse server which stores information, and thereafter the Clearinghouse server directed the user to the Merchant web page. Network Monitoring cannot

argue that the plain language of the claims should be construed in a manner that recaptures the prior art explicitly distinguished in the specification. In fact, "it is not reasonable to read the claims more broadly than the description in the specification, thereby broadening the claims to read on the prior art over which the patentee asserts improvement. . . . Claims are construed with reference to the specification and prosecution history, for these are the resources by which persons in the field of the invention understand what is being invented." *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372–73 (Fed. Cir. 2018).

Consequently, "original URL" should be construed to mean a URL embedded in the response to the Web page request from the user browser.

### C. Contested Term No. 2: "[[at least one]] a rewritten URL" / "the rewritten URL"

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner's Construction |
|---|---|---|
| '416 Patent: claims 1 and 6<br><br>'946 Patent: claims 1 and 17 | Plain and ordinary meaning | "[a / the] URL replacing the URL embedded in the response to the Web page request from the user browser" |

The parties dispute the plain and ordinary meaning of a "rewritten URL" and its related claim limitations. Skyscanner requests the Court construe this term to provide the jury guidance in the proper understanding of this claim term in light of the intrinsic record. *See O2 Micro*, 521 F.3d at 1361-63. Further, the extrinsic evidence support Skyscanner's proposed construction.

As discussed in Section B, above, "original URL" should be construed to mean a URL originally embedded in the response to the Web page request from the user browser before the proxy-agent rewrites it. Because "rewritten URL" is the URL in which the previously written or original URL was "encoded", it should be construed as a/the URL replacing the "original URL" in the Web page response before it is sent to the user browser. It is "[i]n this manner

[that] the URL-proxy is able to intercept further requests initiated by the browser as a result of the user clicking on hyperlinks that reference the rewritten URLs" instead of the original URLs. ('416 Patent, 6:25–31.)

Skyscanner's proposed construction that a rewritten URL is replacing the URL embedded in the response to the Web page request from the user browser is rooted in the claim language and specification as mentioned above. It is also the plain and ordinary meaning of "rewritten." *See, e.g.*, Ex. 2, The Authoritative Dictionary of IEEE Standards Terms. Ex. 3, "rewrite (A) To write again."); The Illustrated Dictionary of Electronics (Seventh Edition) (1997) ("rewrite. In computer operations, to return information read from a storage location to that location by recording.").) The plain and ordinary meaning implies that there was something first written, in this case, the "original URL" embedded in the original response, which was revised and replaced before forwarding the response to the client so that it now first directs the client web browser to the tracking system.

"[R]ewritten URL" is the other half of "original URL." As such, the arguments made above for "original URL" being construed as requested by Skyscanner apply to the rewritten URL, and vice versa. Thus, "rewritten URL" should be construed as a/the URL replacing the URL embedded in the response to the Web page request from the user browser.

**D.    Contested Term No. 3: "form[ing] parameter data based upon predetermined selection parameters from the database"**

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner's Construction |
|---|---|---|
| '416 Patent: claims 1 and 6<br><br>'946 Patent: claims 1 and 17 | Plain and ordinary meaning | Indefinite |

The parties dispute whether "form[ing] parameter data based upon predetermined selection parameters from the database" informs a POSITA about the scope of the invention with reasonable certainty. This claim term is indefinite.

Claim 1 of the '416 Patent and '946 Patent is indefinite because a POSITA would not be able to determine the meaning of the phrase "form[ing] parameter data based upon predetermined selection parameters from the database" with reasonable certainty. *See, e.g., Nautilus*, 572 U.S. at 903. The meaning of this phrase is never made clear throughout the claims, specification, or prosecution history of the Asserted Patents. Even though the term "parameter(s)" is used in the intrinsic record, the evidence never explains what "form[ing] parameter data based upon predetermined selection parameters from the database" entails. See *In re Packard*, 751 F.3d 1307, 1314 (Fed. Cir. 2014) (holding that a claim is indefinite when it contains words or phrases whose meaning is unclear). Instead it uses the term in various scenarios, ascribing different meaning based on the situation. Emphasizing this is the fact that different prefixes, such as, "user-defined," "referral," "algorithm," and "parser-specific" are affixed before the term. *See, e.g.*, '416 Patent at Abstract, 4:16–25, 6:60–64, 10:26–29.

The specification distinguishes between a "referral parameter" and a "user-defined parameter," explaining that "[r]eferral parameters are user-defined parameters that may be used to logically group and query report data." '416 Patent at 6:62–64. However, nowhere in the specification is a "predetermined selection parameter" defined. It is clear from the specification that the various "parameters" are ascribed different meaning.

Dr. Omid Kia's declaration does not alter this analysis. Dr. Kia claims that a POSITA would understand that "parameters" is used consistent with its plain and ordinary meaning. He cites various places in the '416 Patent where the term is used. But Dr. Kia's cites only emphasize how the term is used in a variety of ways referencing different ideas. In fact, he references twelve paragraphs that use the term in at least five different ways. A POSITA could

not glean a plain and ordinary meaning from this. Quite the contrary, this shows that the term is ascribed no clear meaning. The intrinsic record is silent as to the meaning of "form[ing] parameter data based upon predetermined selection parameters from the database," and a POSITA would therefore be unable to ascertain the scope of the claim with reasonable certainty, leaving the claim indefinite.

E.   Contested Term No. 4: "dynamically maintain[ing] the predetermined selection parameters based upon revisable, operator-defined instructions on how to select and extract information from a text page; and analyzing the parameter data sets to predict future user activity"

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner's Construction |
|---|---|---|
| '416 Patent: claims 5 and 10 | Plain and ordinary meaning | Indefinite |

The parties dispute whether "dynamically maintain[ing] the predetermined selection parameters based upon revisable, operator-defined instructions on how to select and extract information from a text page; and analyzing the parameter data sets to predict future user activity" informs a POSITA about the scope of the invention with reasonable certainty. Claims 5 and 10 of the '416 Patent are indefinite.

This term does not survive the ambiguity of the "predetermined selection parameters" contained within. Without a definite interpretation of "predetermined selection parameters" the entire term is ambiguous. As discussed above in Section D, Dr. Kia's expert opinion did nothing to mitigate the ambiguity or "predetermined selection parameters." Accordingly, this claim limitation is indefinite.

**F. Contested Term No. 5: "[[the]] a response" / "[[a]] the response" / "embedding the rewritten URLs in [[the]] a response" / "receiving [[a]] the response from Web server" / "forwarding the response to the user browser"**

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner's Construction |
|---|---|---|
| '416 Patent: claims 1, 2, 6, and 7<br>'946 Patent: claims 1, 10, 17, and 25 | Plain and ordinary meaning | "[a / the] response to the Web page request from the user browser"<br><br>"forwarding the response from the Web server as the response to the Web page request from the user browser" |

The parties dispute the meaning of "[a / the] response," "embedding the rewritten URLs in [[the]] a response," or "forwarding the response to the user browser" and its related claim limitations. Skyscanner requests the Court construe this term to provide the jury guidance in the proper understanding of this claim term in light of the intrinsic record. *See O2 Micro*, 521 F.3d at 1361-63.

The '416 Patent issued a certificate of correction on June 16, 2015. The correction changed claim 6 language from "embedding the rewritten URLs in **the** response" to "embedding the rewritten URLs in **a** response." This was then followed by a correction to claim 7, a dependent claim, where "receiving **a** response from Web server; and forwarding the response to the user browser" was changed to "receiving **the** response from Web server; and forwarding the response to the user browser." The correction identifies the use of "a" for first occurrence. This means that when "response" is used again with "the" as the prefix, it is referring to the same response originally mentioned. The only response it could receive from the Web server would be a response without any embedded rewritten URL. As such, when the term "response is used, it is in reference to the response to the Web page request from the user browser. Without this construction, there would be ambiguity in the term, making it indefinite.

**G.    Contested Term No. 6: "provide profiling and analysis of at least one session"**

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner' Construction |
|---|---|---|
| '946 Patent, claims 1 and 17 | Plain and ordinary meaning | Indefinite |

The parties dispute whether "provide profiling and analysis of at least one session" informs a POSITA about the scope of the invention with reasonable certainty. This claim term is indefinite.

Contrary to Plaintiff's wishes, there is no clear plain and ordinary meaning of "provide profiling and analysis of at least one session." Claims 1 and 17 of the '946 Patent are indefinite because a POSITA would not be able to determine the meaning of "provide profiling and analysis of at least one session" with reasonable certainty. *See, e.g., Nautilus*, 572 U.S. at 903. The meaning of this phrase is never made clear throughout the claims, specification, or prosecution history of the Asserted Patents. While the term "analysis" is used multiple times in the specifications, there is never an explanation of what "analysis" is done. Rather, the specifications only mention how the analysis algorithms work without ever saying what their goal is. For example, "the session analysis algorithm groups logged-pages by browser and log date. The session analysis algorithm groups consecutive logged-pages from the same browser under the same session if the elapsed time between logged-pages are within 30 minutes of each other." '946 Patent at 12:58–62. A POSITA may know that the analysis algorithm pulls "logged-pages," but will have no idea what is analyzed from those pages. This trend permeates the entire patent, and the POSITA is left with an ambiguous idea of what analysis a session delivers. Rather, more ambiguity is introduced as the specifications introduce the POSITA to two different types of analysis, namely "event analysis" (*Id.* at 4:61) and "session analysis" (*Id.* at 12:58).

Dr. Omid Kia's declaration does not alter this analysis. In fact, if anything, it reinforces the analysis. Dr. Kia's declaration quotes multiple paragraphs from the patent totaling almost

four pages including twelve paragraphs. These all have the words "profile" and "analysis" emboldened and yet not a single paragraph explains what is analyzed in a session analysis. (Kia Decl. at 50.) Dr. Kia claims that a POSITA would understand that "provide profiling and analysis of at least one session" is used consistent with its plain and ordinary meaning. *Id*. However, as discussed above, there is no plain and ordinary meaning resulting in ambiguity and indefiniteness. Accordingly, this claim limitation is indefinite.

**H.** **Contested Term No. 7: "3. The method of claim 1, where the causing the Web page specified by the Web server URL to be returned to the user comprises redirecting the user browser to the Web page on the Web browser" / "8. The apparatus of claim 6, where the apparatus causes the Web page specified by the Web server URL . . ." / "11. The apparatus of claim 1, where the apparatus causes the Web page specified by the Web server URL . . ." / The method of claim 17, wherein the Web page specified by the Web server URL . . ."**

| Patent, Claim Number(s) | Network Monitoring's Construction | Skyscanner' Construction |
|---|---|---|
| '416 Patent, claims 3 and 8<br><br>'946 Patent, claims 11 and 26 | Plain and ordinary meaning | "responding with a redirect code that causes the browser to automatically send a second request to the tracking system, this time causing the Web page specified by the Web server URL to be returned to the user" |

The parties dispute the meaning of "causing the Web page specified by the Web server URL to be returned to the user comprises redirecting the user browser to the Web page on the Web browser." Skyscanner requests the Court construe this term to provide the jury guidance in the proper understanding of this claim term in light of the intrinsic record. *See O2 Micro*, 521 F.3d at 1361-63.

The specification mentions only one example of "redirecting" in columns 13 and 14 of the specification. ('416 Patent, 13:66–14:26.) There, it describes a known problem with websites where the user's intent may unintentionally be double counted if the browser is "refreshed," because refreshing re-submits the previous request. A simple example of this

would be where a website displays a payment confirmation page after the user clicks "Purchase." If the user used the browser's "refresh" command, the browser would re-submit previous purchase request, resulting in a second purchase being recorded.

The specification explains the conventional technique for avoiding this common problem: "When a site receives a request to execute a transaction, it responds with a redirect code. The redirect code causes the browser to automatically send a second request, this time retrieving the transaction confirmation page." *Id.* at 14:18–23. That is, the second request back to the website caused by the redirection code eliminated the possibility that the first request was caused by a browser refresh, and the website could confidently process the transaction and send the user to the confirmation page. The specification explains that "[m]ost sites now use HTTP redirects." *Id.* at 14:17.

The Asserted Patents employed a "pre-trigger page" that "model the redirect code." (*Id.* at 14:23–26.) The "pre-trigger page, which maps to an HTTP redirect, has no content." (*Id.* at 15:15–16.) The tracking system would not create an event unless it detected a request for a "trigger page" that was preceded by a request for a "pre-trigger page." Because of this mechanism, "[p]re-trigger pages are used to prevent false-positive results arising from browser refresh." (*Id.* at 13:64–65.)

Network Monitoring wrongly argues that Skyscanner's proposed construction narrows the plain and ordinary meaning of the term. (Opening Br. at 22-23.). The plain and ordinary meaning is not to be evaluated in a vacuum as Network Monitoring attempts to do. It must be considered in the context of the intrinsic record. *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1313 (Fed. Cir. 1313) ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."). Here, the applications explicitly recited a known and conventional "redirect" mechanism that they employed to

prevent false-positives in their claimed tracking system. This mechanism is the only clue as to what the applicants intended by "redirecting the user browser." This mechanism only works because the redirect code makes a second request to the tracking system that distinguishes the first request from one caused by a browser refresh.

Critically, Network Monitoring's proposal would preclude the "present invention" and all described embodiments of a proxy-based tracking system. If the "redirect" does not cause a second request to the tracking system as described in the specification, then it would necessarily cause the browser to send the request somewhere else. This is inapposite to the "present invention" and the claim language itself, in which the tracking system operates as an intermediary and maintains its position as an intermediary by returning the requested web pages with URLs rewritten to point to its system rather than somewhere else. ('416 Patent at 6:28–31) ("In this manner, the URL-proxy is able to intercept further requests initiated by the browser as a result of the user clicking on hyperlinks that reference the rewritten URLs.").) If the redirect caused web page to be returned by sending the second request somewhere other than tracking system, that other system would provide a response to the browser rather than the tracking system. The tracking system would not be able to "embed[] the rewritten URLs in the response," as the claims require, to allow for interception of future requests. (*See, e.g.*, '416 Patent at Claim 1)

A claim construction like Network Monitoring proposes, which excludes the preferred embodiment and prevents the claims from working as described, is "rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Skyscanner's construction should be adopted.

## VI.    CONCLUSION

For the reasons articulated above, the Court should adopt Skyscanner's proposed constructions for the eight terms at issue.

Dated: April 20, 2022

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ Adil A. Shaikh*

Neil J. McNabnay
Texas Bar No. 24002583
David B. Conrad
Texas Bar No. 24049042
Adil A. Shaikh
Texas Bar No. 24117039

1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)
mcnabnay@fr.com
conrad@fr.com
shaikh@fr.com

**COUNSEL FOR SKYSCANNER LTD.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been served on April 20, 2022, to all counsel of record who are deemed to have

consented to electronic service via the Court's CM/ECF system.

*/s/ Adil A. Shaikh*
Adil A. Shaikh